IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

NEAL GREENBAUM, VICTOR JURY,
DALE ARMSTRONG, AND GAIL
ARMSTRONG,
    Plaintiffs-Not Parties to Appeal,
and
ROBERT TORCH,
    Plaintiff-Intervenor-Not a Party to Appeal
and
GIANT CAB COMPANY,
    Plaintiff-Intervenor-Appellee

vS.

AMY BAILEY, Clerk of the City of
Albuquerque, AND THE BOARD OF
ETHICS AND CAMPAIGN PRACTICES, in
their official capacities,
    Defendants-Not Parties to Appeal,
And
THE COMMITTEE TO ELECT PETE
DINELLI MAYOR
    Intervenor-Appellant

Case No. 13-2176

---

## APPELLANT'S BRIEF IN CHIEF

---

Appeal from the United States District Court
for the District of New Mexico
The Honorable M. Christina Armijo
United States District Court No. 1:13-cv-00426-MCA-ACT

Respectfully Submitted:
Committee to Elect Pete Dinelli Mayor
Michael J. Cadigan
Kristina Caffrey
*Counsel for Intervenor-Appellant*
*The Committee to Elect Pete Dinelli Mayor*
3840 Masthead NE
Albuquerque, NM 87109
(505) 830-2073

ORAL ARGUMENT REQUESTED

DECEMBER 16, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

PRIOR AND/OR RELATED APPEALS....................................................................1

STATEMENT OF JURISDICTION..........................................................................1

STATEMENT OF THE ISSUES................................................................................2

STATEMENT OF THE CASE...................................................................................2

STATEMENT OF FACTS..........................................................................................5

SUMMARY OF ARGUMENT...................................................................................8

ARGUMENT..............................................................................................................10

I. STANDARD OF REVIEW....................................................................................10

II. THE CORPORATE CONTRIBUTION BAN DOES NOT VIOLATE THE

FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION.........................11

      A. Intermediate Scrutiny is Appropriate.................................................................11

      B. A Procedural Note.............................................................................................18

      C. Law Regarding "Sufficiently Important Governmental Interest".......................20

            1. The Evidentiary Burden of Showing Corruption....................................28

            2. The Evidence Produced Below................................................................38

      D. Law Regarding "Closely Drawn"......................................................................49

CONCLUSION AND RELIEF SOUGHT.........................................................................62

STATEMENT REGARDING ORAL ARGUMENT.........................................................62

CERTIFICATE OF COMPLIANCE REGARDING ELECTRONIC SUBMISSION……..64

CERTIFICATE OF COMPLIANCE REGARDING WORD COUNT…………………...65

CERTIFICATE OF SERVICE…………………………………………………………….66

ATTACHMENTS:

FINDINGS OF FACT AND CONCLUSIONS OF LAW, DOCUMENT 69,

    SEPTEMBER 4, 2013

JUDGMENT, DOCUMENT 70, SEPTEMBER 4, 2013

## **TABLE OF AUTHORITIES**

### **Supreme Court Cases**

*Austin v. Michigan State Chamber of Commerce*, 494 U.S. 664 (1990)............................16, 17

*Buckley v. Valeo*, 424 U.S. 1 (1976)...................................................................12, 22, 35

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)...............15, 16, 17, 18, 24

*Federal Election Commission v. Beaumont*, 539 U.S. 146 (2003)......................11, 12, 14, 16, 17,
18, 21, 24, 51, 52, 53, 60

*Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238 (1986)............13

*Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480
(1985).......................................................................................................22

*McConnell v. FEC*, 540 U.S. 93 (2003)...................................................................23, 24

*Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000).......  12, 13, 21, 22, 31, 32, 34,
35, 36, 38, 40, 43-44

*Randall v. Sorrell*, 548 U.S. 230 (2006)........................................................................34

*Renton v. Playtime Theatres*, 475 U.S. 41(1986).........................................................31

*Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180 (1997)..................................34

### **10th Circuit Cases**

*Z.J. Gifts D-2, LLC v. City of Aurora*, 136 F.3d 683 (10th Cir. 1998)............................10

*Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008)..............................10

### **Cases from Other Circuit Courts**

*Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013)...........34, 36, 37, 41

*Citizens for Clean Government v. City of San Diego*, 474 F.3d 647 (9th Cir. 2007)...............23, 24

*Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir. 2010)................13, 14, 17, 35, 37,
38, 40, 56, 57-58, 60

*Ognibene v. Parks*, 671 F.3d 174 (2nd Cir.2007)...................................13, 15, 23, 24, 25,
26, 27, 31, 32, 33, 34, 35, 37, 38, 42-43, 46, 54, 55, 56

iii

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011)...............13, 16, 17, 24, 51, 52, 53

*United States v. Danielczyk*, 683 F.3d 611(4th Cir. 2012).................................................17, 18, 21

## **Statutes**

42 U.S.C. §§ 1983.......................................................................................................................1

42 U.S.C. §§ 1988.......................................................................................................................1

28 U.S.C. §§ 1331, 1343(a)(3),(4).............................................................................................1

28 U.S.C. §§ 2201, 2202.............................................................................................................1

28 U.S.C. § 1291.........................................................................................................................2

## **Rules**

Rule 4(a)(1), F.R.A.P..................................................................................................................2

## **Other Authority**

United States Constitution, Amendment I....................................................................................1

Charter of the City of Albuquerque, Article XIII, § 4(f)...................................................1, passim

Charter of the City of Albuquerque, Article XIII....................................................................6, 7, 8

Charter of the City of Albuquerque, Article XVI....................................................................6, 54

Charter of the City of Albuquerque, Article XII....................................................................7, 8

## PRIOR AND/OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Plaintiffs brought this action pursuant to 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and via the federal declaratory judgment act, 28 U.S.C. §§ 2201 and 2202.  Plaintiffs asserted that the case arose under the Constitution and laws of the United States, as protected by 42 U.S.C. § 1983 and1988. Appellant's Appendix page 3.

The District Court entered Findings of Fact and Conclusions of Law and Judgment sua sponte on September 4, 2013. Applt.App.pp.475-484. The parties had previously briefed a Motion to Dismiss and a Motion for Preliminary Injunction/Temporary Restraining Order, although the District Court's ruling did not explicitly address either Motion. The Court's Judgment permanently enjoined the City Clerk of Albuquerque and the City of Albuquerque Board of Ethics and Campaign Practices from enforcing Article XIII, § 4(f) of the Albuquerque City Charter against business corporations and declared that Article XIII, § 4(f) violated the First Amendment of the United States Constitution. The Judgment was a final order that disposed of all parties' claims.

Intervenor Committee to Elect Pete Dinelli Mayor timely provided Notice of Appeal in accordance with Rule 4(a)(1) F.R.A.P. on October 2, 2013. Applt.App.p. 485. Appellate jurisdiction is pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

A. Did the District Court err in determining that Article XIII, §4(f) of the Albuquerque City Charter violates the First Amendment of the United States Constitution?

1. Did the District Court err in determining that Article XIII, §4(f) was not "closely drawn" to further an important governmental interest?

2. Did the District Court err in finding that the parties defending Article XIII, §4(f) failed to carry their evidentiary burden?

## <u>STATEMENT OF THE CASE</u>

The voters of Albuquerque amended the City Charter through the October 2007 municipal election to prohibit candidates from accepting contributions from corporate entities.

Six years later, on May 6, 2013, Plaintiffs filed a lawsuit against the Clerk of the City of Albuquerque and the City of Albuquerque Board of Ethics and Campaign Practices, both in their official capacities, alleging that the amendment to the Charter violates the First and Fourteenth Amendments of the United Constitution.

2

The Complaint sought both Declaratory and Injunctive Relief. On May 8, 2013, the Committee to Elect Pete Dinelli Mayor filed in the District Court a Motion for Leave to File a Complaint in Intervention, and on May 10, 2013, the parties consented to allow the Committee to submit a Complaint in Intervention. On May 13, 2013, the Committee (styled only "Intervenor") submitted its Complaint in Intervention. Applt.App.pp 44-48. The Complaint contained one and only one claim: for a Declaratory Judgment that Article XIII §4(f) is valid and constitutional.

Additionally, Plaintiff Giant Cab Company entered the case as an Intervenor, and the original four Plaintiffs were dismissed from the case due to lack of standing on August 19, 2013. Applt.App.p.473.

Throughout May and June of 2013, the parties briefed a Motion to Dismiss and a Motion for Preliminary Injunction/Temporary Restraining Order. The Court denied the Motion for Preliminary Injunction/Temporary Restraining Order on June 25, 2013 and ordered, "All evidence that the parties wish to have the Court consider in ruling on the merits shall be submitted by Tuesday, July 9, 2013." Applt.App.p.314. That Order also stated, "Further briefing, other than replies in support of pending motions, will not be allowed." The parties submitted written evidence. The Committee to Elect Pete Dinelli, as part of its evidence submission, submitted an affidavit recounting the comments of the City Councilors at a

February 5, 2007 meeting. Applt.App.pp. 342-358. After one of the Plaintiffs moved to strike that affidavit, the Committee submitted a DVD recording of the meeting to all parties and to the District Court. The District Court then ordered authentication of the DVD. Michael Cadigan, former City Councilor and counsel for the Committee, authenticated the DVD recording. Applt.App.p 472.

Article XIII §4(f) states, "No candidate shall accept a contribution in support of the candidate's campaign from any corporation, limited liability company, firm, partnership, joint stock company or similar business entity or any agent making a contribution on behalf of such a business entity. No candidate shall accept a contribution in support of the candidate's campaign from any person, other than a City employee, who at the time of the contribution is in a contractual relationship with the City to provide goods or services to the City."

The original Plaintiffs were all individuals, but the District Court determined that they did not have standing to challenge any part of the law. The individual Plaintiffs did not have standing to challenge the ban on contributions from a "corporation, limited liability company, firm, partnership, joint stock company or similar business entity," and neither did they have standing to challenge the ban on contributions from "any agent making a contribution on behalf of such a business entity" or "any person, other than a City employee, who at the time of the contribution is in a contractual relationship with the City to provide goods or

services to the City" because none of the Plaintiffs fell within either of those two categories. Applt.App.p. 473.

The District Court did determine that Plaintiff-Intervenor Giant Cab Company had standing to challenge the ban on contributions from a "corporation…or similar business entity," and restricted its decision to that portion of the law.

The District Court entered Findings of Fact and Conclusions of Law and Judgment sua sponte on September 4, 2013.Applt.App.pp 475-484. Intervenor Committee to Elect Pete Dinelli timely appealed. Applt.App.p. 485. Appellee Giant Cab Company filed a Motion to Dismiss in the 10th Circuit, alleging lack of standing, on October 17, 2013. On November 4, 2013, as directed by the 10th Circuit, Appellant filed its Response. The 10th Circuit then directed the parties to proceed with a regular briefing schedule.

The District Court found that the corporate contribution ban violated the First Amendment and permanently enjoined the Clerk and the Board of Ethics and Campaign Practices from enforcing the ban.

## STATEMENT OF FACTS

On February 5, 2007, the nine members of the Albuquerque City Council voted unanimously to approve an amendment to the Albuquerque City Charter that would prohibit candidates for City office from accepting contributions from

corporate entities. R-06-157 was a proposition to be submitted to voters, and it was sponsored by City Councilor Michael Cadigan. When Mayor Martin Chavez neither signed nor vetoed the resolution, the proposition passed into law as R-2007-010. From there, it went directly on the October 2, 2007 regular municipal election ballot, where 71.9% of voters approved of the contribution ban. Applt.App.pp.66-73.

The amendment thus became part of the Albuquerque City Charter at Article XIII, §4(f). Article XIII provides that the City Clerk and the City's Board of Ethics and Campaign Practices enforce the provisions of Article XIII, although Article XIII also allows citizens or groups to bring actions before the Board of Ethics and Campaign Practices. The Board of Ethics and Campaign Practices thus acts as a quasi-judicial body that hears complaints from citizens or groups that a candidate or public official has violated some provision of the Charter. The Board then decides whether such a violation has occurred and recommends an appropriate sanction.

Article XIII of the City Charter is entitled, "Election Code." Article XIII governs candidates who choose to accept private financing, meaning contributions from private individuals. The Albuquerque Charter also contains Article XVI, the "Open and Ethical Election Code," which creates and governs a public financing

system for City elections, in which candidates qualify for public financing and then receive a set amount of money from the City itself to conduct their campaigns.

Article XII of the City Charter, entitled "Code of Ethics," creates and governs the Board of Ethics and Campaign Practices. Both Article XII and Article XIII create a private right of action to enforce the Charter's election laws. Article XIII (the Election Code), Section 10 is titled "Enforcement:" "(a) *Charges of Violations.* I. Any charge or charges that a candidate or the chairperson of a Measure Finance Committee or any other group has committed a violation of this Election Code or of the Rules and Regulations promulgated by the Board shall be made in writing, notarized and brought before the Board." Article XII (the Code of Ethics) also has an "Enforcement" section, Section 8: "(a) Any charge of violations of this Code of Ethics shall be brought before the Board of Ethics and Campaign Practices. Any private citizen may initiate such a charge in accordance with regulations established by the Board of Ethics and Campaign Practices."

Under both Article XII and Article XIII, penalties are assessed against candidates, not contributors: Article XII, Section 8 states, "(b) Should the Board find, after due hearing, that a violation has occurred, it may make a public reprimand or impose a fine of not to exceed $500 for each violation or do both," and Article XIII, Section 10 states, "e) Should the Board find, after due hearing, that a violation of this Election Code or the Rules and Regulations of the Board has

7

occurred, it may, for each violation, issue a public reprimand or impose a fine not to exceed the maximum amount authorized by state law, or do both," "(g) In addition to imposing such sanctions, or as an alternative thereto, and if the violator be a successful candidate in the election, the Board may recommend to the Council that the violator be removed from office," and "(h) The Council may, upon the recommendation of the Board, and after due hearing of the charge, order the suspension or removal of an elected official."

Article XIII §4(f) itself provides for a remedy: "The remedy for an unknowing violation of this subsection shall be the return of the contribution."

Because the District Court's ruling confined itself to the ban on contributions from a "corporation…or similar business entity," it is not necessary to discuss here any definitions applicable to the other portions of Article XIII §4(f).

The District Court in its Findings of Fact and Conclusions of Law found that "Giant Cab is a corporation doing business in New Mexico" and "Giant Cab made a contribution to Janice Arnold Jones for City Council, but that donation was returned. Giant Cab desires to make campaign contributions in Albuquerque municipal elections, and would do so but for §4(f)." Applt.App.p. 476.

## SUMMARY OF ARGUMENT

The Charter Provision does not violate the First Amendment. The District Court found that the provision was not "closely drawn" to an important

8

governmental interest, Applt.App.p. 475-482, but it did so without properly taking into account *all* of the government's interests, without properly taking into account *all* of the evidence offered in defense of the Charter Provision, and without considering the wide variety of alternatives for political expression available under the Charter.

The Plaintiff's challenge to the law relied mostly on misinterpretations of the *Citizens United* case, even though a careful reading of that case reveals that it has little, if any, relevance to contribution regulations.

A governmental entity's regulation of contributions to political campaigns is subject o intermediate scrutiny, but the scrutiny the District Court applied resembled strict scrutiny rather than intermediate scrutiny. Under the intermediate level of scrutiny, the defender of a campaign contribution regulation must first identify sufficiently important governmental interests and then demonstrate that the regulation is closely drawn to further those interests.

The City of Albuquerque had sufficiently important governmental interests in preventing quid pro quo corruption, preventing the appearance of corruption, and preventing circumvention of individual campaign contribution limits. The City of Albuquerque closely drew its law to further those interests while leaving open many other avenues of political expression.

9

# ARGUMENT

## I. STANDARD OF REVIEW

The appellate court reviews "constitutional facts and conclusions of law de novo." *Z.J. Gifts D-2, LLC v. City of Aurora*, 136 F.3d 683, 685 (10th Cir. 1998). In matters of Constitutional import, "this court is obligated to make an independent examination of the record in its entirety." *Id*. As such, after that examination, the appellate court "may direct that judgment be entered in favor of any moving party if the record adequately supports it." *Id*. A challenge to the constitutionality of a statute is reviewed de novo. *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1027 (10th Cir. 2008).

Although the District Court addressed certain pieces of evidence in its Findings of Fact and Conclusions of Law, it also ignored key parts of the record that support the constitutionality of Article XIII §4(f) and particularly ignored parts of the record that addressed the requirement that the law be "closely drawn" to an important governmental interest. Additionally, in its Findings of Fact and Conclusions of Law, the Court repeatedly mentioned the "evidentiary burden" of proving that Article XIII §4(f) was "closely drawn" to important governmental interests and demanded evidence of "perception among Albuquerque voters." The record has both argument and evidence that satisfy the evidentiary burden.

10

Appellant asks the Court to recognize that the record *does* contain sufficient support for the constitutionality of Article XIII §4(f).

## II. THE CORPORATE CONTRIBUTION BAN DOES NOT VIOLATE THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

The first step in analyzing whether Article XIII §4(f) violates the First Amendment is to correctly identify the applicable standard of scrutiny.

A. Intermediate Scrutiny is Appropriate

An intermediate level of scrutiny is appropriate for laws that address contributions, as opposed to expenditures. Because the City's Charter Article XIII § 4(f) (hereinafter referred to as "Charter Provision") affects contributions rather than expenditures, it will survive if it is closely drawn and furthers an important governmental interest. Again, the actual language of the relevant portion of the Charter Provision: "No candidate shall accept a contribution in support of the candidate's campaign from any corporation, limited liability company, firm, partnership, joint stock company or similar business entity."

The Supreme Court recently considered an analogous campaign finance provision in *Federal Election Commission v. Beaumont*, 539 U.S. 146 (2003). There, federal statute 2 U. S. C. § 441b(a) made it unlawful for a corporation to make a contribution in connection with federal elections. The Court affirmed "the basic premise we have followed in setting First Amendment standards for

11

reviewing political financial restrictions: the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association," *Id*. at 161, and also reminded readers that "[g]oing back to *Buckley v. Valeo,* 424 U.S. 1… (1976), restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *Id*. Because of this distinction between expenditures and contributions, "instead of requiring contribution regulations to be narrowly tailored to serve a compelling governmental interest, a contribution limit involving significant interference with associational rights passes muster if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id*. (internal citations and quotation marks omitted).

   *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000) also recounted and reaffirmed the distinction between expenditures and contributions (expenditures being money spent by candidates in support of their campaigns, and contributions being money given by individuals to campaigns). Contribution limits "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *Nixon* at 387, quoting *Buckley v. Valeo*, 424 U.S. 1, 22. "We have consistently held that restrictions on contributions require less compelling justification than restrictions

on independent spending." *Id*. at 387, quoting *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 259–260 (1986), and as such, "a contribution limit involving 'significant interference' with associational rights…could survive if the Government demonstrated that contribution regulation was 'closely drawn' to match a 'sufficiently important interest.'" *Nixon* at 387-388.

Numerous cases have agreed that contributions attract only an intermediate level of scrutiny: *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1113 (9th Cir. 2011) ("nearly four decades after the Watergate break-in *Buckley*'s expenditure-contribution distinction continues to frame the constitutional analysis of campaign finance regulations.");[1] *Ognibene v. Parks*, 671 F.3d 174, 183 (2nd Cir.2007) ("contribution limits and bans are permissible as long as they are closely drawn to address a sufficiently important state interest."); *Green Party of Connecticut v. Garfield*, 616 F.3d 189, 198 (2d Cir. 2010) ("a law limiting contributions 'passes muster if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest.'" quoting *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 387-88 (2000) (some internal citations omitted)).

The fact that the language of the Charter Provision focuses on the candidate should not change the analysis. The Charter Provision's language revolves around

---

[1] Although the mention of a case called *Nixon* in close proximity to mention of the Watergate scandal might lead to the assumption that the two are related, the *Nixon v. Shrink Missouri Government* case has nothing whatsoever to do with President Richard Nixon.

the candidate: "No candidate shall accept a contribution…," but the political activity at issue remains contributions, not expenditures. Whether the candidate can or cannot accept such a contribution depends on whether a corporation or other listed entity has actually made that contribution.

Furthermore, the fact that the Charter Provision is a "ban" rather than a "limitation" or "restriction" does not change the level of scrutiny. The challengers in *Federal Election Commission v. Beaumont* tried to heighten the level of scrutiny by characterizing the federal law as a total ban rather than just a limitation. However, "[i]t is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." *Id.* at 162. This means that whether a law restricting contributions operates as a "ban" or simply a "limitation" will not kick the level of scrutiny up or down; it simply means that when applying the mid-level scrutiny of closely drawn/important governmental interest, a reviewing court may consider whether a total ban is "closely drawn" enough to match the important government interest.

Again, the principle that a "ban" rather than a "limitation" does not change the level of scrutiny finds support across numerous cases. *Green Party of Connecticut v. Garfield*, 616 F.3d at 199 ("The Court has always applied that lower standard …even when the law in question imposed an outright *ban* on

14

contributions," and "As *Beaumont* concisely explained: 'It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself.'"); *Ognibene v. Parks*, 671 F.3d at 183 ("contribution limits *and* bans are permissible as long as they are closely drawn to address a sufficiently important state interest"); *Ognibene v. Parks*, 671 F.3d at 194 ("The Supreme Court has held that the 'degree of scrutiny turns on the nature of the activity regulated,' not on the fact that contributions are outright banned, as opposed to just limited. *Beaumont,* 539 U.S. at 162, 123 S.Ct. 2200.") Accordingly, the more lenient standard of review also applies to the entity ban.

In the District Court, Plaintiffs attempted to rely on *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) in order to increase the level of scrutiny, but even this well-publicized case does *not* mandate anything more than intermediate scrutiny for contribution regulations. The law at issue in *Citizens United*, 21 U.S.C. § 441(b), banned "independent expenditures" by corporate speakers. *Id*. at 318-319. The Citizens United group specifically "feared, however, that both the film and the ads would be covered by § 441b's ban on corporate-funded independent expenditures, thus subjecting the corporation to civil and criminal penalties." *Id*. at 321.

15

Thus, *Citizens United* concerned the expenditure rights of corporations—not their contribution rights. If the Charter Provision in question here also said, "Corporations cannot expressly advocate the election or defeat of City candidates or to broadcast electioneering communications within 30 days of a City election," an examination of the Charter Provision through the lens of *Citizens United* would be warranted. But because the Charter Provision only reaches contributions to candidates, *Citizens United* has no applicability here and does not change the analysis.

Cases decided after *Citizens United* have come to the consensus that *Citizens United* left intact the previous regime applicable to contributions. See *Thalheimer v. City of San Diego*, 645 F.3d at 1113:

> Recent Supreme Court decisions, notably *Citizens United v. FEC,* 558U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), have once again placed the constitutionality of campaign finance reform in flux, inspiring new challenges to election laws across the  country…[but] *Buckley*'s expenditure-contribution distinction continues to frame the constitutional analysis of campaign finance regulations.

*Thalheimer* also performed an in-depth analysis of the impact of *Citizens United* on the *Beaumont* case:

> Plaintiffs argue that *Beaumont* has been overruled by *Citizens United,* and that the anti-circumvention interest is no longer valid. They base this contention on the *Beaumont* Court's citations to *Austin* [*v. Michigan State Chamber of Commerce*, 494 U.S. 664 (1990)], which partially relied on an anti-circumvention rationale to uphold a limit on corporate political expenditures…Plaintiffs fail to recognize, however, that the *Citizens United*

16

> Court rejected *Austin* for its reliance on the distinct "anti-distortion"
> rationale that allowed spending restrictions based on the tendency of
> "immense aggregations of wealth" accumulated via the corporate form to tilt
> the political playing field. *See Citizens United,* 130 S.Ct. at 907. The anti-
> distortion interest is based on an equality rationale,…whereas the anti-
> circumvention interest is part of the familiar anti-corruption
> rationale…Moreover, the *Citizens United* Court's disapproval of *Austin*
> came  in the context of regulating political expenditures, not contributions.
> The Court made    clear that it was not revisiting the long line of cases
> finding anti-corruption rationales sufficient to support such limitations.

*Id.* at 1124. Thus, "there is nothing in the explicit holdings or broad reasoning of

*Citizens United* that invalidates the anti-circumvention interest in the context of

limitations on direct candidate contributions." *Thalheimer* at 1125. See also *Green*

*Party of Connecticut* at 199 ("Although the Court's campaign-finance

jurisprudence may be in a state of flux (especially with regard to campaign-finance

laws regulating corporations), *Beaumont* and other cases applying the closely

drawn standard to contribution limits remain good law.")

The case *United States v. Danielczyk*, 683 F.3d 611 (4th Cir. 2012) directly

confronted what *Citizens United* left undecided. *Citizens United* addressed the

constitutionality of 2 U.S.C. § 441(b)(a), which originally made it unlawful for

corporations to make both direct contributions to political candidates and

independent expenditures on speech. *Citizens United* "struck down § 441b(a)'s

prohibition against corporate independent expenditures, reasoning in part that the

ban was not supported by the interest in preventing quid pro quo corruption," but

17

*Citizens United* "left untouched § 441b(a)'s ban on direct corporate contributions."
*United States v. Danielczyk*, 683 F.3d at 614.

 *United States v. Danielczyk*, 683 F.3d 611, 615(4th Cir. 2012) then affirmed
the constitutionality of § 441b(a)'s ban on direct corporate contributions. It also
held, "*Beaumont* clearly supports the constitutionality of § 441b(a) and *Citizens
United,* a case that addresses corporate independent expenditures, does not
undermine *Beaumont*'s reasoning on this point." *Id*.

 Appellant will first discuss the law governing what is a "sufficiently
important government interest," then will discuss the interests served by the
Charter Provision, then discuss the "closely drawn" requirement, and finally show
that the Charter Provision is "closely drawn."

B. A Procedural Note

 Before that discussion, however, Appellant must make a brief procedural
note. As described much more thoroughly in the Appellant's Response to Appellee
Giant Cab Company's Motion to Dismiss, Appellant the Committee to Elect Pete
Dinelli was an Intervenor in the District Court. It took the position of defending the
validity of the Charter Provision, and in fact, it was the principle defender of the
validity of the Charter Provision.

 When instructed by the District Court to produce evidence, the City of
Albuquerque produced only one affidavit; Intervenor Committee to Elect Pete

Dinelli produced seven affidavits, including one recounting comments made at the February 5, 2007 City Council meeting at which the Charter Provision was first approved (Applt.App.p. 342). Intervenor-Plaintiff-Appellee Giant Cab Company then made a Motion to Strike that affidavit. In response, Intervenor Committee to Elect Pete Dinelli sent a copy of a DVD showing the entire City Council meeting to all of the parties and to the Court.[2] The District Court then ordered Intervenor Committee to Elect Pete Dinelli to authenticate the DVD. Michael Cadigan, former City Councilor and attorney for Intervenor Committee to Elect Pete Dinelli, who was present at the meeting, authenticated the DVD (Applt.App.p. 472). Certain of the Court's Findings of Fact indicate that the Court reviewed the DVD recording.[3]

Appellant discusses this here in order to make clear that the Affidavit regarding comments made at the City Council meeting was a part of the record relied upon by the Court. Appellant also points this out to apprise the Court that the materials put forward by the City of Albuquerque in "support" of the Charter Provision do not tell the entire story. This Court can and *should* also look to the evidence and argument offered in support of the Charter Provision by Intervenor Committee to Elect Pete Dinelli.

---

[2] The City of Albuquerque broadcasts all City Council meetings, and thus recordings are available.

[3] Mr. Cadigan is involved in this litigation purely as an attorney representing Intervenor-Appellant Committee to Elect Pete Dinelli Mayor, and not in any official capacity as sponsor of the Charter Provision or representative of the City Council.

Additionally, the Attorney General of New Mexico submitted an Amicus Brief and also submitted detailed factual support for its Amicus Brief. See Applt.App. pp. 317, 379. This material contains additional argument and evidence in support of the Charter Provision's constitutionality.  Plaintiffs did move to strike the Attorney General's submissions, but the District Court never struck them, and they remain part of the record for this Court to review.

C. Law Regarding "Sufficiently Important Governmental Interest"

The District Court was only partially correct in its identification of the "sufficiently important government interest" supporting the Charter Provision. There are two interests, and the Court gave short shrift to the second, and therefore incompletely considered whether the Provision was "closely drawn" to *both* interests. The District Court should have given greater consideration to *both* interests, and this would have changed the determination of whether the provision is "closely drawn."

In its Conclusion of Law #5, the District Court wrote, "Given existing precedent, there is no question that preventing quid pro quo corruption or the appearance of corruption and preventing the circumvention of individual campaign contribution limits are important governmental interests." This statement is the bare minimum, and it fails to express the larger scope of the government—and public—interest in addressing corruption.

20

In its Conclusion of Law #4, the District Court wrote, "*Citizens United* preserved two of the four important government interests recognized in *Beaumont*: anti-corruption and anti-circumvention." It then cites to *Danielczyk* at 618. While this is a correct quotation from *Danielczyk*, it leaves the impression that *Citizens United* narrowed the available government interest more than it actually did. *Danielczyk* goes on to say at 683 F.3d 618, "Prevention of actual and perceived corruption and the threat of circumvention are firmly established government interests that support regulations on campaign financing" and that "*Citizens United* did not undercut *Beaumont*'s endorsement of [the anti-circumvention] interest." *Id.* at 618-619.

In fact, the government's interest in addressing both actual corruption and the appearance of corruption is both broad and deep, and numerous courts have recognized it from the 1970s all the way to the present. "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined," but "[o]f almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Nixon v. Shrink Missouri Government*, 528 U.S. at 388.

In reviewing *Buckley v. Valeo*, the *Nixon* court recalled, "Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent.'" *Id*. at 388-389, quoting *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976). Indeed, "[c]orruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *Id*. at 389, quoting *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480, 497 (1985). This corruption is wider than the classic money-for-vote trade: "In speaking of 'improper influence' and 'opportunities for abuse' in addition to "*quid pro quo* arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors." *Id*., quoting *Buckley*, 424 U.S. at 28. This also extends to the *perception* of such corruption: "The public interest in countering that perception was, indeed, the entire answer to the overbreadth claim raised in the *Buckley* case." *Nixon* at 390.

*Buckley* has continued to guide law regarding the interest that can support contribution regulations: "The paradigmatic sufficient state interest under *Buckley* is the prevention of corruption, or the appearance of corruption, in the political

process…Limits on political contributions serve the government's interest in preventing corruption because they reduce the risk of *quid pro quo* arrangements" and "mitigate 'the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office.'" *Citizens for Clean Government v. City of San Diego*, 474 F.3d 647, 652 (9th Cir. 2007) (internal citations omitted). See also *Ognibene*, 671 F.3d at 187 ("Improper or undue influences includes both traditional *quid pro quo* and more discreet exchanges of money for favorable outcomes").

One of the reasons for extending the "corruption" definition beyond merely quid pro quo is the difficulty of criminalizing more stealthy and subtle forms of corruption:

> Just as troubling to a functioning democracy as classic *quid pro quo* corruption is the danger that office-holders will decide issues not on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions valued by the officeholder. Even if it occurs only occasionally, the potential for such undue influence is manifest. And unlike straight cash-for-votes transactions, such corruption is neither easily detected nor practical to criminalize.

*Citizens for Clean Government v. City of San Diego*, 474 F.3d at 652, quoting *McConnell v. FEC*, 540 U.S. 93, 153 (2003). In First Amendment matters, governments must navigate between the choices of prior restraint and subsequent punishment. However, subsequent punishment of subtle corruption and undue

23

influence is much more difficult than subsequent punishment of "straight cash-for-votes transactions," which means the government has a greater need to restrain this type of activity *before* it occurs. Therefore, the Supreme Court has "rejected any narrower conception of corruption as 'crabbed' and 'ignor[ing] precedent, common sense, and the realities of political fundraising.'" *Id.*, quoting *McConnell v. FEC*, 540 U.S. at 152. See also *Ognibene*, 671 F.3d at 187 ("because the scope of *quid pro quo* corruption can never be reliably ascertained, the legislature may regulate certain indicators of such corruption or its appearance").

Another aspect of corruption is circumvention, in which individuals or groups use related entities to circumvent contribution limits. This is a well-recognized interest: "The City contends that the prohibition on contributions by corporations, unions, committees, and other organizations serves the purpose of preventing the circumvention of individual contribution limits. The Supreme Court recognized the anti-circumvention interest in *FEC v. Beaumont,* 539 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003)." *Thalheimer*, 645 F.3d at 1109 (see also, *supra* at page 9-11and 12-13, how *Beaumont*'s anti-circumvention interest is still in good standing after *Citizens United*.)

*Citizens United*, again, did nothing to change the status of preventing corruption as an important governmental interest. "*Citizens United* confirms, yet again, that eliminating corruption or the appearance thereof is a sufficiently

24

important governmental interest…This interest exists even where there is no actual corruption, because the perception of corruption, or of opportunities for corruption, threatens the public's faith in democracy." *Ognibene*, 671 F.3d at 186.

Appellant here has quoted at length from cases in which a municipality, rather than a state or the federal government, has sought to regulate contributions, and the fact that there are so many cases involving municipalities shows the particular danger of contributions at lower levels of government. Appellant discussed this in its Motion to Dismiss (Applt.App.p. 62): "The rationale for limiting the influence of corporations in politics is slightly different at the local level than at the national level, and local governments may have a greater interest in preventing corporate and contractual entanglement with elected officials," because "at the municipal level of Albuquerque, the Mayor and individual City Councilors have a great degree of autonomy and power to award favors and projects to friends and past contributors. In fact, Mayors can specifically recommend to the Council that certain companies provide services for specific projects." At the federal level, the "quid pro quo" transaction might be money for votes, because as Appellant wrote, on "a federal level, corporations compete for government contracts…[but] those awards receive consideration from many Congresspeople *and* unelected officials in a variety of executive agencies, and the owners and managers of these corporations number in the hundreds or thousands,

25

rather than the mom-and-pop owned companies competing for local dollars."
Conversely, at the local level, the "quid pro quo" transaction is more likely to be
money-for-special treatment, in which, as Appellant (Applt.App.p. 63) wrote,
"corporations and their owners and managers using campaign contributions to
curry favor with candidates so that if that candidate obtains office, the candidate
will reward the corporation and its owners and managers with a contract to, say,
construct a park or road or municipal building." Therefore, "to accomplish their
goals of greater influence on local government function, corporations and
individuals with government contracts would seek to curry favor with *individual*
Mayoral and Councilor candidates." Applt.App.p. 63.

New York City also recognized this particular problem of local government;
the 2nd Circuit in *Ognibene v. Parkes*, 671 F.3d at 187, wrote of the danger when
"donors make large contributions because they have business with the City, [or]
hope to do business with the City." "Contributions to candidates for City office
from persons with a particularly direct financial interest in these officials' policy
decisions pose a heightened risk of actual and apparent corruption, and merit
heightened government regulation." *Id*. at 188. The "policy decisions" of local
governments—zoning, neighborhood revitalization, minority hiring quotas,
procurement contracts, service contracts, lifestyle laws (such as smoking bans or
soft drink regulations), environmental codes—are in fact more likely to directly

26

impact the financial interests of local businesses than policy decisions of the federal government—like nuclear arms treaties or surveillance laws. It makes sense, then, that the cities of New York City, San Diego, and Albuquerque, amongst others, have passed laws restricting or banning contributions from corporate entities.

Regulating the contributions of corporate entities also makes more sense at municipal level due to the lesser amount of regulation of local businesses generally. Large, publicly traded corporations must comply with federal disclosure regulations. However, local governments, especially ones in smaller locations like Albuquerque, New Mexico, are more likely to deal with smaller businesses, and this poses a greater danger to transparency and disclosure. "Transparency is a particular problem for LLCs because many are involved in city business, especially land use, yet there are minimal disclosure requirements and often no publicly available information about the owners." *Id*. at 196. That was even true for New York City, the largest city in the United States. In Albuquerque, New Mexico, it would be even more true. LLCs or partnerships do a lot of business with the City, yet there are minimal disclosure requirements and often no publicly available information about the owners.

Additionally, while a United States Senator may represent millions of constituent individuals and businesses, a municipal official—like one of the nine

City Councilors of Albuquerque—may only represent tens of thousands of people and thousands of local businesses. Thus, the "buying power" of a contribution to a candidate for municipal office is much greater. The contribution dollar goes much farther when given to a municipal office-holder rather than, say, a candidate for Senator or president.

Preventing actual or perceived corruption is definitely a sufficiently important governmental interest, so the next step is determining the evidentiary burden of showing that a government holds that interest.

1. The Evidentiary Burden of Showing Corruption

The District Court in its Findings of Fact and Conclusions of Law, Applt. App. 475-482, placed an improperly high and unnecessarily demanding evidentiary burden on the defenders of Article XIII, §4(f). This improper standard is particularly harsh when considered in light of the fact that the District Court did not pre-announce its standards. The District Court did not hold any type of evidentiary hearing and relied on submissions of evidence alone. However, the parties submitted that evidence with no guidance as to the factors the Court would or would not consider.

Particularly, the Court stated in Conclusion of Law #8, "Unless and until the City Council develops an evidentiary record demonstrating (1) a likelihood that there is a perception among Albuquerque voters that corporate campaign

contributions lead to 'pay to play' corruption or that corporate contributions are employed to circumvent individual contribution limits," the "ban…cannot be sustained." The District Court also stated in Finding of Fact #18, "the Court has no way of knowing why these voters approved the amendment...whether they were motivated by the constitutionally permissible interest in eliminating or reducing...corruption, as opposed to the...desire to single out corporate political speech." The law does not require that Courts read the minds of voters. The District Court's focusing of the microscope on voters was incorrect.

Also incorrect was the District Court's self-prescribed standards and expectations regarding what should have been in the record. In its Finding of Fact #15, the Court wrote, "Other than the passing comments by the City Council members referred to above, the Court has not been presented with any legislative history of § 4(f). There are no findings by the City Council. There is no evidence proffered that the City actually investigated the relationship of corporate campaign contributions to *quid pro quo* corruption or the circumvention of individual contribution limits or that the City Council conducted studies or surveys of voter concerns with corporate campaign contributions. There was no discussion of why an absolute ban on corporate contributions, rather than a contribution limit, was appropriate." The Court was both incorrect on its fact and its law. The Court was presented with legislative history in the form of a DVD recording of the actual City

29

Council meeting at which § 4(f) was discussed (see Applt.App. pp. 456, 471, 472). That discussion contains "findings," albeit not in any formal format. More importantly, as will be shown below, the law does *not* require legislative history, findings, investigations, studies, or surveys.

The District Court also took the City of Albuquerque to task for not proffering any evidence "that the City Council, prior to enacting the resolution placing § 4(f) on the ballot, considered objective evidence of the extent of participation by business corporations in 'pay to play' schemes or the use by individuals of the corporate form to circumvent individual contribution limits." The law does not require such history—rather, the law presumes that if such scandals have received widespread media attention, legislators will know of this "objective evidence" and will act appropriately.

The District Court drastically overstated the evidentiary requirements, and this led to an erroneous decision. Circuit Courts and the Supreme Court have upheld contribution bans on far slimmer evidence than what Appellant-Intervenor proffered below.[4]

Likewise, the law does not require "references in the record to evidence developed by other jurisdictions that the City Council 'reasonably believed to be

---

[4] In addition to Appellant-Intervenor, the New Mexico Attorney General as amicus curiae also presented defensive evidence.

relevant' to the problem of *quid pro quo* corruption or the appearance of such

corruption in Albuquerque municipal elections" as the District Court demanded in

its Finding of Fact #16. And even if there was such a requirement, the City Council

met that requirement when Councilor Michael Cadigan asserted that his proposed

Charter amendment would bring City law in line with federal law. And in fact, the

District Court recognized this in Finding of Fact #13, which states, "Councillor

[sic] Michael Cadigan, represented to the City Council that the purpose of the

provisions banning corporate campaign contributions was to 'match federal law.'"

Applt.App.p.477.The District Court's own Findings of Fact contradict one another.

     The District Court's requirement was directly contrary to Supreme Court

precedent: "The First Amendment does not require a city, before enacting such an

ordinance, to conduct new studies or produce evidence independent of that already

generated by other cities." *Renton v. Playtime Theatres*, 475 U.S. 41, 51(1986). In

that case, like here, a lower court ruled that "the Renton ordinance was enacted

without the benefit of studies specifically relating to the particular problems or

needs of Renton,'" and therefore the "city's justifications for the ordinance were

'conclusory and speculative.'" *Id*. at 50. The Supreme Court, however, thought

"the Court of Appeals imposed on the city an unnecessarily rigid burden of proof."

*Id*.

31

Both *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000) and

*Ognibene v. Parks*, 671 F.3d 174 (2nd Cir.2007) involved laws passed by voters,

but neither opinion focused on what may have gone through voters' heads. Rather,

both opinions placed the majority of focus on other sources of evidence.

Additionally, both cases assumed that if a majority of voters approved of the

contribution regulations, those voters must have considered such a regulation to be

in furtherance of an important governmental interest. In short, neither case required

the average voter to have taken a course in Constitutional Law.

In fact, by focusing on voters, the District Court made exactly the same

mistake that the plaintiffs in *Nixon* did: "they take the State to task, as the Court of

Appeals did, for failing to justify the invocation of those interests with empirical

evidence of actually corrupt practices or of a perception among Missouri voters

that unrestricted contributions must have been exerting a covertly corrosive

influence. The state statute is not void, however, for want of evidence." *Id*. at 390-

391. Rather, the Supreme Court allowed the government of Missouri to describe

the interest of preventing corruption and then stated, "although majority votes do

not, as such, defeat First Amendment protections, the statewide vote on

Proposition A certainly attested to the perception relied upon here: '[A]n

overwhelming 74 percent of the voters of Missouri determined that contribution

limits are necessary to combat corruption and the appearance thereof.'" *Id*. at 394, quoting the District Court decision below.

In *Ognibene v. Parks*, 671 F.3d 174, 190 (2nd Cir.2007), the Second Circuit found it self-evident that a majority vote indicates that the public is concerned about corruption: "The fact that City voters passed the referendum approving these reforms speaks powerfully to the public perception that further regulation of campaign contributions by those who do business with the City is needed." For the Second Circuit, the very *fact* of voter approval signals that the public has a perception that further regulation of campaign contributions by those who do business with the City is needed.

Here, the Court need not attempt a retrospective poll of what Albuquerque voters perceived in 2007. The very fact that 71.9% of those voters approved of the Charter Provision is a crystal clear signal that the public perceived that further regulation of campaign contributions by corporate entities was necessary (Applt.App.p. 70).

The record of voters is only one small piece of the evidentiary showing, however. Courts around the country have maintained a very loose evidentiary burden. Evidence of a sufficiently important government interest can come in any form and can be either contemporaneous or after-the-fact. It does not even have to be direct evidence; it can be circumstantial: "The record contains sufficient

evidence from which one could *infer* circumvention and perceive corruption."

*Ognibene v. Parks*, 671 F.3d at 195 (emphasis added).

The inquiry must start with recognition that courts must defer to legislative

judgments. The Supreme Court itself has "pointed out that courts must defer to

legislative findings because legislatures are 'far better equipped than the judiciary

to amass and evaluate the vast amounts of data bearing upon legislative

questions.'" *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 283 (4th

Cir. 2013), quoting *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 195

(1997). This is true even in cases where, like the West Virginia law at issue in

*Center for Individual Freedom, Inc. v. Tennant*, the "legislature provides little, if

any, formal legislative history," *Id*. at n. 4, or where, like Missouri, the state "does

not preserve legislative history." *Nixon v. Shrink Missouri* 528 U.S. at 393.

Even if the legislature does not keep history up to the standards that the

Library of Congress does for the United States Congress, courts still assume that

the legislature "has institutional expertise in the field of election regulation and

effectively curbed these scandals in the first place." *Ognibene*, 671 F.3d at 189.

Courts "have no scalpel to probe each possible contribution level. We cannot

determine with any degree of exactitude the precise restriction necessary to carry

out the statute's legitimate objectives…Thus ordinarily we have deferred to the

legislature's determination of such matters." *Id*., quoting *Randall v. Sorrell*, 548 U.S. 230, 248 (2006).

Once the Court accepts that it must defer to legislative considerations, the question becomes what type of evidence must be produced to support a sufficiently important government interest. While no case has defined "what may be necessary as a minimum," *Nixon v. Shrink Missouri*, 528 U.S. at 391, courts have articulated what that minimum is *not*. "[R]espondents are wrong in arguing that in the years since *Buckley* came down we have supplemented its holding with a new requirement that governments enacting contribution limits must demonstrate that the recited harms are real, not merely conjectural." *Id*. at 391-392 (internal quotation marks omitted). Likewise, "Appellants argue that *Green Party* [*of Connecticut v. Garfield*] requires evidence of recent scandals in order to justify any contribution restriction, not just a ban…This is not what *Green Party* says. There is no reason to require the legislature to experience the very problem it fears before taking appropriate prophylactic measures." *Ognibene*, 671 F.3d at 188. What *Green Party* actually did say was that circumstantial evidence was enough: "The record before us, moreover, shows that the General Assembly *had good reason to be concerned* about both the 'actuality' and the 'appearance' of corruption involving contractors…And it took *no great leap of reasoning to infer* that those scandals created a strong *appearance* of impropriety." *Green Party of Connecticut*

35

*v. Garfield*, 616 F.3d at 200 (first and second italics added, third italics in original).

"It is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption." *Ognibene*, 671 F.3d at 183.

All of these standards suggest that the evidence supporting the sufficiently important government interest need not be contemporaneous with the law's passage. That is, the government does not need to point to a specific piece of legislative history. Rather, the law's defenders can point to pieces of evidence compiled after-the-fact to show that, at the time, the legislature could have reasonably inferred that there was actual corruption or the appearance of corruption.

In *Nixon v. Shrink Missouri Government*, 528 U.S. at 393, the State produced

> an affidavit from State Senator Wayne Goode, the co-chair of the state legislature's Interim Joint Committee on Campaign Finance Reform at the time the State enacted the contribution limits, who stated that large contributions have 'the real potential to buy votes.' The District Court cited newspaper accounts of large contributions supporting inferences of impropriety…One report questioned the state treasurer's decision to use a certain bank for most of Missouri's banking business after that institution contributed $20,000 to the treasurer's campaign…Another made much of the receipt by a candidate for state auditor of a $40,000 contribution from a brewery and one for $20,000 from a bank. (internal citations omitted)

In *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir.

2013), West Virginia presented "affidavits that West Virginia used to establish the

need to regulate periodicals," language in the statute itself mentioning the

legislature's fear that "[f]ailing to regulate non-broadcast media messages would

permit those desiring to influence elections to avoid the principles and policies that

are embodied in existing state law," an affidavit from the executive director of the

West Virginia Democratic Legislative Council indicating that an advocacy group

had "shifted its spending from broadcast media to newspaper advertisements so it

did not have to comply with West Virginia's reporting requirements," and a

spreadsheet that the "chairman of the West Virginia State Democratic Party had

compiled detailing third-party spending during select 2006 and 2008 West Virginia

elections," *Id*. at 284. This was enough for the Fourth Circuit.

In *Ognibene v. Parkes*, New York City did produce a New York City

Charter Revision Commission report that "concluded that there was no doubt that

these contributions have a negative impact on the public because they promote the

perception that one must pay to play." *Id*. at 179, and a City Council Committee

Report that stated,

> the ability of such individuals [doing business with the city] to contribute
> could create a perception, regardless of whether such perception is accurate,
> that such individuals have a higher level of access to the City's elected
> officials. It is important to eradicate this perception and reduce the

appearance of undue influence associated with contributions from
individuals doing business with the City.

*Id*. at 180.

In *Green Party of Connecticut v. Garfield*, 616 F.3d 189, 193 (2d Cir. 2010),
the state relied on evidence of several recent corruption scandals, including one in
which the Governor of Connecticut accepted gifts "in exchange for assisting the
contractors in securing lucrative state contracts." That governor resigned and later
pled guilty to federal criminal charges. The lower court "provid[ed] examples of
newspaper articles covering Connecticut's corruption scandals." *Id*. at 200. The
Second Circuit stated, "There is sufficient evidence in the record of actual
corruption stemming from contractor contributions, and in light of the widespread
media coverage of Connecticut's recent corruption scandals, the General Assembly
also faced a manifest need to curtail the appearance of corruption created by
contractor contributions." *Id*.

All in all, the "quantum of empirical evidence needed to satisfy heightened
judicial scrutiny of legislative judgments will vary up or down with the novelty and
plausibility of the justification raised." *Nixon v. Shrink Missouri Government*, 528
U.S. at 391. "Mere conjecture" will not suffice, *Id*. at 392, so the "justificatory
burden [lies] somewhere between a concrete showing of actual *quid pro quo*

corruption and the sort of "mere conjecture" that the Supreme Court has deemed

out of bounds." *Ognibene* at 188.

2. The Evidence Produced Below

Appellant produced more than enough evidence to justify the Charter

Provision, including evidence of actual corruption and evidence that legislators

were concerned about the appearance of corruption.

In its Reply in support of the City of Albuquerque's Motion to Dismiss,

Intervenor attached as an Exhibit a Memorandum from the Public Citizen group, a

non-partisan campaign finance watchdog organization, called "Pay-to-Play Laws

in Government Contracting and the Scandals that Created Them" (Applt. App.p.

105). It had a specific section on New Mexico and noted, "In response to a series

of procurement scandals, New Mexico adopted pay-to-play laws in 2006." If

procurement scandals prompted the State of New Mexico to adopt pay-to-play

laws in 2006, then it makes perfect sense that the City of Albuquerque would

follow in 2007. Specifically, the scandals concerned contracts with local

businesses: "The Bernalillo County Metropolitan Courthouse conspiracy involved

long-time New Mexico Senate President Pro-Tem Manny Aragon. Aragon had

suggested that Design Collaborative Southwest ("DCSW") be hired to complete

the architectural design of the courthouse" (App.p. 118). "Along with Marc Schiff,

a DCSW partner, and former Albuquerque Mayor Kenneth Schultz, Aragon

encouraged the submission of over-inflated invoices for the company's benefit. These invoices cost the state of New Mexico an additional $4,374,286." Given that this scandal implicated not only State officials (Aragon) but Albuquerque officials (Schultz), it makes perfect sense that the City of Albuquerque would want to pass its own laws instead of relying on the State ones. After detailing other scandals, Public Citizen concluded, "While the state has come a long way from the days of 'this is how business is done,' stronger procurement laws could further reduce a pay-to-play culture, increase contracting fairness, and reduce corruption or the appearance of corruption."

This was evidence of actual corruption, and this report is exactly the same type of evidence produced in *Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir. 2010): evidence that a well-publicized scandal existed before the implementation of the subject law (the Public Citizen article includes citations to contemporaneous news reports of the Aragon/Schultz scandal), a scandal in which public officials were sent to prison for corruption, including for improperly profiting off of public procurement contracts.

The District Court in its Finding of Fact #9 (Applt.App.p 476) also alluded to former Albuquerque Mayor Martin Chavez receiving a public reprimand in 2003 for "accepting valuable gifts from those with an interest in city affairs, failing to report certain campaign contributions and failing to abide by contribution limits.

The inquiry leading to the reprimand and the reprimand itself were reported in the *Albuquerque Journal*." The New Mexico Attorney General produced the evidence alluding to the Chavez scandal. See Applt.App.p. 379. Again, this is exactly the kind of evidence produced in *Nixon* and *Green Party*.

Given these scandals, the City Council and the voters of Albuquerque had good reason to be concerned about both the actuality and the appearance of corruption involving contractors, and it takes no great leap of reasoning to infer that those scandals created a strong appearance of impropriety. See supra at page 25. The District Court in its Finding of Fact #12 stated, "It is more likely than not that all the members of the City Council, and substantial numbers of Albuquerque voters, knew of the circumstances set out in the preceding three paragraphs, as these events were widely reported by the local media." If the voters knew of these circumstances, it takes no great leap of reasoning (leaps are which allowed by precedent explained above) to infer that that knowledge created a strong suspicion of impropriety in the minds of voters. Applt.App.p 477.

In *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013), West Virginia presented a spreadsheet that the chairman of the West Virginia State Democratic Party had compiled detailing third-party spending during select 2006 and 2008 West Virginia elections. Likewise, here Intervenor

Committee to Elect Pete Dinelli compiled affidavits showing suspicious contributions in past Albuquerque elections (Applt.App.p. 342-358).

Those affidavits were titled "Regarding Dale Armstrong" (345), "Regarding Common Contributions" (347), and "Regarding Corporate and Corporate Representative Contributions to Candidates for City Office" (353).

The first—"Regarding Dale Armstrong"—addressed the contribution history of Plaintiff Dale Armstrong. It showed that Dale Armstrong not only gave money to candidates, but that corporate entities of which Mr. Armstrong was Owner or President *also* gave money to candidates. Thus, Dale Armstrong was using his various corporate entities to *circumvent* individual contribution limits. For example, in 2005, a Mayoral election year, Armstrong individually gave $4,515 to candidate Martin Chavez. That same year, TLC Plumbing and Cooling, of which Mr. Armstrong was the President, gave an *extra* $500 to Martin Chavez. Thus, Armstrong skirted the individual contribution limit by giving money through a corporate entity controlled by him. That is clear circumvention, and it is a clear indication of the appearance of corruption.

Additionally, the affidavit regarding Armstrong shows that he—and companies controlled by him—gave contributions to candidates regardless of political affiliation. Sometimes he gave to Democrats, sometimes to Republicans, and in the immediate lawsuit, he wanted to give money to candidate Richard Berry,

who had previously ousted Martin Chavez. Thus, Armstrong was clearly only interested in contributing to the incumbent Mayoral candidate. [Chavez was the incumbent Mayoral candidate in 2005 and 2009; Berry was the incumbent Mayoral candidate in 2009.]

These are indicia of pay-to-play corruption: "When those who do business with the government or lobby for various interests give disproportionately large contributions to *incumbents*, *regardless of their ideological positions*, it is no wonder that the perception arises that the contributions are made with the hope or expectation that the donors will receive contracts and other favors in exchange for these contributions." *Ognibene v. Parkes*, 671 F.3d at 187. Dale Armstrong gave contributions to incumbents and gave contributions to candidates regardless of their ideological positions, and thus the perception arises that the contributions are made with the expectation that Armstrong would receive contracts and other favors in exchange for these contributions. And of course, Armstrong owns the exact kind of business that could receive contracts or other favors: a plumbing and cooling company. With plenty of municipal buildings, community centers, police stations, and a municipal water and sewer system to maintain, TLC could foresee a great deal of business opportunity.

These same principles—circumvention of individual contribution limits, contribution to candidates regardless of ideological position, and greater

contributions to incumbents—also play out in the "Regarding Common Contributions" affidavit. There, multiple individuals are seen contributing to *both* sides in one race, as if to ensure that no matter who wins, they will be on the winner's good side. Multiple individuals are seen giving contributions individually *and* as part of a corporate entity they control. That habit kills two birds with one stone: 1) the business itself gains favor for a possible City contract down the road; and 2) the individual skirts contribution limits. Multiple individuals are also shown giving contributions to candidates from different Districts. This indicates that the contribution is given in lieu of a vote—that is, if an individual cannot support a candidate through a vote, he can attempt to gain favor and access to that candidate through a contribution. When supported with money instead of actual ideological support, candidates become more susceptible to answer to the money, rather than the vote.

For example, Mesa Verde Development contributed $900 to Republican candidate for District 4 Brad Winter in 2003, $1,000 to Republican candidate for Mayor Brad Winter in 2005, $1,000 to Democratic candidate for Mayor Martin Chavez in 2005, and $450 to Democratic candidate for District 5 Michael Cadigan in 2005. When a business gives the same amount of money to opposing candidates in the same race, it is clear that the business does not care who actually wins—it just cares about gaining favor with whichever candidate happens to win. Thus, it

gives based *not* on the existing policy positions of the candidates, but rather it gives based on the desire to influence future policy. Here, that policy would be the land and housing development of the City of Albuquerque.

This is the exact kind of improper and undue influence explained above. It is not just quid pro quo corruption that presents a threat to government, but the implication that "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." See supra at page 17, quoting *Nixon.* And because such corruption is less obvious, and thus less capable of prosecution after-the-fact, it must be prevented through measures such as Article XIII, § 4(f).

The "Regarding Corporate and Corporate Representative Contributions to Candidates for City Office" affidavit again shows contributors circumventing individual contribution limits *and* seeking undue influence. That desire for undue influence is seen by contributions to candidates regardless of party preference or geography. For example, in 2005, Douglas Vaughan individually and the Vaughan company *both* gave $450 (the limit for that year's Council candidates) to City Council candidate Sally Mayer, which is clear circumvention. The business "Dekker/Perich/Sabatini, LTD" and Dekker, Perich, and Sabatini individually contributed to candidates from four different Council districts and to several Mayor candidates. The implication of this contribution history is that both the business

and its principles desired access to and influence of candidates, rather than desiring to show their support for a particular ideological position. Preventing that kind of favoritism is clearly a sufficiently important government interest, as shown above.

One of the other Affidavits presented by Intervenor Committee to Elect Pete Dinelli was "Regarding Contemporaneous Legislation" (Applt.App.p. 349), and that affidavit shows that legislators had public corruption on their minds at both the City and State level, and it is more than sufficient to show that legislators across New Mexico were responding to the recent corruption scandals. At the City level, 2006 saw passage of a new "public purchases ordinance" that tightened how the City awarded contracts. It also required new reporting requirements linking campaign contributors with companies having "business dealings with the City." This shows that the City Council of Albuquerque was deeply concerned about the appearance of corruption. Its first solution was to mandate reporting requirements of contributors having business dealings with the City. A ban on corporate contributions is entirely in line with the previous law.

State legislators also had corruption on the brain. 2007—the same year as Article XIII, § 4(f) was proposed and passed—saw an explosion of ethics reform proposals in the New Mexico State legislature. This again proves that corruption and the appearance of corruption was a well-recognized problem in New Mexico by 2007.

The widespread interest in addressing corruption brings up a necessary reminder from the caselaw: governments are allowed to take prophylactic action to prevent corruption. "Appellants essentially propose giving every corruptor at least one chance to corrupt before anything can be done, but this dog is not entitled to a bite…There is no reason to require the legislature to experience the very problem it fears before taking appropriate prophylactic measures." *Ognibene*, 671 F.3d at 188. That is, governments can take steps to prevent the bite of corruption from ever happening. If the State of New Mexico started a corruption-prevention frenzy, the City of Albuquerque was free to join the movement even without evidence of actual corruption. Here, not only did the City have evidence of actual corruption, but it logically and appropriately joined the anti-corruption frenzy sweeping the state. Likewise, the voters of the City of Albuquerque could have seen the wave of similar legislation rolling through the halls of the Roundhouse in Santa Fe and inferred that Article XIII, § 4(f) was also an appropriate measure to counteract the dangers of government corruption.

Finally, the greatest evidentiary support that Article XIII, § 4(f) was enacted in order to prevent actual corruption, the appearance of corruption, and circumvention comes from the comments of the City Councilors themselves. The affidavit, "Regarding Legislative History" recounts the February 5, 2007 meeting (Applt.App.p. 357). As explained in its Response to Motion to Strike Legislative

47

History Affidavit (App.p. 456), Intervenor Committee to Elect Pete Dinelli

obtained a DVD recording of the City Council meeting from the City Council

Services department of the City of Albuquerque and based its affidavit upon

viewing of that DVD. Later, Intervenor gave copies of that DVD to all parties and

to the Court itself. Former Councilor Michael Cadigan then authenticated that

DVD (App.p. 472).

      The discussion clearly shows that, contrary to the District Court's Finding of

Fact #15, City Councilors believed corporate campaign contributions related to

quid pro quo corruption, the appearance of corruption, and circumvention of

individual contribution limits. The resolution's sponsor, Michael Cadigan,

explained that his provision "removes perception ... that in government ... you have

to pay to play ..." and that the provision would increase "support for integrity of all

our public offices" and give "confidence to the public that we are not being paid to

play." This relates to the recognized interest in preventing the appearance and

perception of corruption.

      According to Councilor Cadigan, corporations would "no longer [be]

obligated to contribute to campaigns," and the provision would change the

"unwritten rule" that contributions are necessary. This relates to the perception that

an entire system of pay-to-play exists in which corporations feel an *obligation* to

contribute or risk missing out on business opportunity.

48

Councilor Cadigan was not alone in noting a perception of corruption: Councilor Martin Heinrich supported the resolution, noting the existence of a public perception that "everybody's on the take" and "everybody's engaged in a pay to play atmosphere." Councilor Debbie O'Malley noted that some members of the public had a perception of "wheeling and dealing" in City government.

Councilor Heinrich addressed the circumvention interest, explaining that the ban on contributions by corporate entities would prevent the situation of "somebody donating the maximum amount as an individual and then their company turns around and donates the maximum amount as well." He expressed his belief that the resolution "will prevent that kind of double dipping." The contribution histories shown in the other affidavits clearly show the situation Councilor Heinrich feared: somebody donating the maximum amount as an individual and then having his or her company turn around and donate as well. Councilor Heinrich's fear of circumvention was *not* mere conjecture; it was well borne out in fact.

Councilor Heinrich also made a point about the existence of the City's public financing system that will become relevant in later discussion of whether the Provision is "closely drawn." Heinrich noted that the public financing scheme, as an alternative to private financing, would give elected officials an "unassailable position in the eyes of the public."

49

D. Law Regarding "Closely Drawn"

Now that Appellant has proven that sufficiently important governmental interests underlie Article XIII, § 4(f), the next step is to determine whether Article XIII, § 4(f) is "closely drawn" to those interests. Again, the District Court placed unnecessarily demanding burdens on the defenders of Article XIII, § 4(f), and in doing so, ignored key explanation and evidence showing that Article XIII, § 4(f) is indeed closely drawn to further the interests of preventing actual corruption, preventing the appearance of corruption, and preventing circumvention.

The District Court wrote in Finding of Fact #15, "There was no discussion of why an absolute ban on corporate contributions, rather than a contribution limit, was appropriate." This ignores that the "Legislative History" affidavit recounted that Albuquerque City Attorney Bob White discussed with City Councilors if and when the ban would reach individuals and noted that the real focus was on corporations with City contracts. This makes clear that the specific *quid pro quo* transaction the City Council feared was contributions-for-City-contracts. This adds an extra shade to both the governmental interest and the "closely drawn" test. The City Council specifically targeted business entities because of its fear that those business entities would use contributions to gain favor with the elected officials who hand out City contracts. This fear is borne out by the contribution history recounted above—plumbing, development, and architectural firms competing for

50

business during the boom time of municipal construction in the 2000s. Thus, the

comments by City Attorney Bob White and Administrative Officer Perlman *do*

relate to why it must be a ban, rather than a restriction.

Courts around the country have held that bans on contributions by certain

entities satisfy the closely drawn test, and have recognized that limits, as opposed

to bans, may not effectively combat actual and/or perceived corruption.

*Thalheimer v. City of San Diego*, 645 F.3d 1109, 1114 (9th Cir. 2011) upheld

a very similar municipal enactment. San Diego's "organizational contribution"

ban, "ECCO § 27.2950, prohibits 'any person other than an individual' from

contributing to a candidate or candidate-controlled committee.'" The ordinance

defines "person" as including "any individual, proprietorship, firm, partnership,

joint venture, syndicate, business trust, company, corporation, association,

committee, labor union, or any other organization or group of persons acting in

concert." *Id.* "The effect of the provision is to bar contributions to candidates from

all organizations and other non-individual entities." *Id*.

The Ninth Circuit found the law closely drawn enough:

> [Challengers] seek to distinguish *Beaumont* by noting that even though the
> [Supreme] Court upheld a total ban on corporate contributions, its tailoring
> analysis took into account that corporations retained the option of
> establishing political action committees that could make contributions to
> candidates…By contrast, the relevant ECCO provisions ban all non-
> individual contributions, so there is no PAC alternative. While this is a
> legitimate distinction, the *Beaumont* Court also stated that a 'ban on direct

corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information.' *Id.* at 161 n. 8, 123 S.Ct. 2200.

Implicit in both the Supreme Court's *Beaumont* analysis and the Ninth Circuit's analysis is examination of the availability of alternatives. That is, if the law leaves other avenues of political expression open, the law is more likely to qualify as "closely drawn." Indeed, the Ninth Circuit wrote, "importantly, San Diego's regulations allow non-individual entities to make unlimited independent expenditures, and with ECCO § 27.2936 enjoined, they can also make unlimited contributions to independent committees that can be used to fund expenditures supporting or opposing candidates." *Thalheimer* 645 F.3d at 1125.

Appellant-Intervenor made exactly this argument in its Brief in Support of the City's Motion to Dismiss (Applt.App.p. 56): "The Charter Provision does nothing to prevent corporations from allocating funds to independent expenditures (in the Albuquerque City Charter, they are called Measure Finance Committees'). This means that corporations and people with City contracts have a huge area of political activity open to them." Appellant-Intervenor then cited to *Beaumont*, 539 U.S. at 153 and its discussion of the "Political Action Committee" alternative: "The PAC option allows corporate political participation without the temptation to use corporate funds for political influence, quite possibly at odds with the

sentiments of some shareholders or members, and it lets the Government regulate campaign activity through registration and disclosure."

The Albuquerque City Charter still allows corporate entities to participate in "Measure Finance Committees" and make contributions to those groups. Corporate entities could also form their own Measure Finance Committees to make independent expenditures. The District Court seems to have completely ignored this argument, but it is crucial. It makes the current situation directly equivalent to *Thalheimer* and *Beaumont*.

Appellant-Intervenor pointed out an additional alternative: the City of Albuquerque's *public* financing system. In that same Brief (Applt.App.p. 56), Appellant-Intervenor wrote, "The existence of an entirely alternate campaign finance system is another point in favor of the Charter Provision being closely drawn. Candidates for City office can choose to not even worry about complying with Article XIII § 4(f) by qualifying for public financing." City Councilor Martin Heinrich brought up the public financing system in the City Council meeting and expressed his belief that the *combination* of a corporate contribution ban *and* the public financing system would make candidates "unassailable in the eyes of the public."

The combination of the contribution ban and the public financing system is crucial for two reasons. First, as Councilor Heinrich alluded, candidates who

choose to forego the public finance system must *also* be answerable to ethics

expectations. The public financing system removes a huge specter of corruption,

but it would make no sense to let those who do not opt for public financing get

away without any regulation. Thus, Article XIII § 4(f) ensures that *all* candidates,

whether privately financed or publicly financed, remember their ethical duty to the

electorate. Second, the City Council had to create incentives for candidates to opt

*in* to the public financing system. The City of Albuquerque's public financing

system, encoded in Article XVI of the Charter, gives candidates a set amount of

money. To qualify, the candidate must collect a large amount of "qualifying

contributions" of $5 each from registered voters in the City. Given the set amount

of funds and the rather large hurdle of qualification for those funds, it makes sense

to give candidates an incentive to opt in, rather than simply take their chances with

private financing. The incentive is the corporate contribution ban; if candidates

know that they cannot depend on contributions from deep-pocketed corporate

entities, they will be more likely to opt *in* to public financing.

Indeed, if Article XIII § 4(f) does not survive, the public financing system of

the City of Albuquerque is effectively dead, because candidates will have no

reason not to pursue private financing. The District Court ignored the City's public

financing system, and in doing so, ignored evidence and argument that Article XIII

§ 4(f) is "closely drawn" to very important governmental interests.

The existence of a public financing system makes this situation very much like *Ognibene v. Parks*, 671 F.3d 174 (2nd Cir.2007). New York City also has a public financing system, and its experience shows exactly why corporate contributions are essential to the survival of public financing. New York City's system matched private contributions at a rate of six dollars in public funds for every one dollar in private contributions. In 1998, the Charter Revisions Commission proposed and the voters of New York City passed a Charter amendment that prohibited corporate contributions for all candidates participating in the public financing system. *Id*. at 179. That was not enough, however. The New York City Council later enacted a separate ban on corporate contributions to *all* candidates, including those candidates not participating in public financing. *Id*. Thus, New York City found out long before Albuquerque that a ban on corporate contributions to *all* candidates is a necessary component of a public financing system. In New York, the ban applies to corporations and entities like LLCs, LLPs, and partnerships. *Id*. at 180.

Part of New York City's logic had to do with the anti-circumvention rationale, just as it did here: "The Committee Report explained that the expansion of the corporate contribution ban addressed a 'loophole' that allowed similarly structured business entities to circumvent the contribution limits." *Id*.

*Ognibene* also has persuasive authority related to why a *ban*, as opposed to a *limitation*, is necessary. "While a limit may address the actual and perceived corruption, it does not entirely eliminate it because some exchange of money is still allowed. When the appearance of corruption is particularly strong due to recent scandals, therefore, a ban may be appropriate." *Id*. at 185. Again, the District Court here downplayed the important of preventing the appearance of corruption, and thus downplayed the need for a ban, rather than a limitation. "In fact, as noted in *Green Party,* while a limit may be sufficient to address actual corruption, the appearance and public perception of corruption may be so grave as to merit a ban." *Ognibene* at 186.

That brings us to *Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir. 2010). Like New York City and Albuquerque, Connecticut also has a public financing system for candidates. *Id*. at 192. It chose a total ban on contributions from "state contractors, 'prospective' state contractors,[and] the 'principals' of contractors." *Id*. As shown by Councilor Cadigan's discussions with City Attorney Bob White and Chief Administrative Officer Bruce Perlman at the City Council meeting regarding how the ban would apply to corporations and their constituents, reaching contractors and prospective contractors was a clear intention of Article XIII § 4(f).

56

While none of the other cited cases actually articulated a standard for determining if a law is "closely drawn," *Green Party* actually framed the issue as "whether the CFRA's contribution bans impermissibly infringe the First Amendment rights of the discrete groups of citizens it regulates." *Id*. at 201. This again brings up the availability of alternatives. Article XIII § 4(f) reaches only a small portion of the First Amendment rights of the discrete groups it regulates— those groups may still make contributions to Measure Finance Committees and create and run Measure Finance Committees. The constituents of corporations, LLCs, and other similar entities may still make $5 "qualifying contributions" to publicly financed candidates, provided they are registered to vote in Albuquerque. The constituents of corporations, LLCs, and other similar entities may still hold signs on street corners, make phone calls, stuff envelopes, and put up yard signs.

*Green Party* did acknowledge the First Amendment concern of banning contributions. The act of making a contribution is a "symbolic expression of support," *Id*. at 204, and while Article XIII § 4(f) may disallow the expression of support via a direct contribution to a candidate, it leaves open other routes of expression: direct advocacy via independent expenditures, advocacy via contributions to political action committees, advocacy by providing a gathering place for supporters, expression by the entity's constituents via their own personal bank accounts.

57

*Green Party*, however, explained that bans, rather than limitations, are necessary to combat the appearance and perception of corruption: "Combating *actual* corruption, however, is not the state's only interest here; the CFRA is also meant to address the *appearance* of corruption caused by contractor contributions," and "[e]ven if small contractor contributions would have been unlikely to influence state officials, those contributions could have still given rise to the appearance that contractors are able to exert improper influence on state officials." *Id*. at 205 (emphasis in original).

Given this principle, the District Court's Findings of Fact # 20 is irrelevant, unnecessary, and leads to the incorrect assumption that the appearance of corruption only arises when contributions exceed the dollar limits. The District Court is factually incorrect as well—the affidavits of Appellant-Intervenor Committee to Elect Pete Dinelli contain several examples of situations in which "combined contributions" (of both an individual and an affiliated corporation) exceeded the individual contribution limit. See Applt.App.pp. 342-358.

However, the District Court again misses the point about the more subtle ways that corruption can rear its head. Corporate entities can indicate their desire for undue influence and can indicate their expectation of special treatment with a $100 contribution just as much as they can with a $200 contribution. Again, the context of a mid-size municipality matters. While candidates for federal office or

candidates in New York City may amass war chests of millions of dollars from

thousands of donors, a City Council candidate in Albuquerque may amass only

tens of thousands of dollars from a much smaller pool of donors. A $200

contribution to a candidate for Senator will not mean much, but a $200

contribution to a candidate for City Council of Albuquerque will mean much,

much more. In such races, with overall much smaller amounts of spending, a $100

contribution from a corporation can make a real difference to the candidate's

campaign, and thus, a real difference in the decisions that candidate makes when

he or she gets into office.

Here, small corporate contributions do have a likelihood of influence

candidates, especially for City Council, and those small contributions—especially

with the contribution limit to Council candidates hovering below $500 (as alluded

to in the Court's Finding of Fact #19)—can still give rise to the appearance that

corporations are able to exert improper influence on state officials.

The District Court in its Conclusion of Law #7 identifies the "First

Amendment problem with § 4(f)" as "the City Council's approach of simply taking

another jurisdiction's contribution restrictions 'off the rack' without meaningful

consideration of whether those restrictions fit local conditions," but this criticism is

both incorrect and has no basis in law. The Court does not identify what "other

jurisdiction" Albuquerque took its provision from. Perhaps the Court means

Albuquerque copied the federal government. In that case, the Court should have praised the City Council, rather than criticized it. Attempting to bring municipal law into consistency with federal law is a common and commendable effort. Although not included in the "Legislative History" affidavit, the DVD recording of the City Council meeting provided to the Court also shows City Councilor Sally Mayer expressing approval of the effort to apply federal principles to municipal elections.

Furthermore, the District Court cited no law for its requirement that legislation not be "off the rack." And in fact, there is no such requirement. While states and cities can decide to act as "laboratories" for untested law before it reaches the federal level, there is no requirement that they do so. Rather, states and cities are free to examine what has worked at the federal level, and what has been deemed constitutional at the federal level, and decide to apply it at the local level. To continue the District Court's analogy, states and cities need not seek out haute couture laws. They can find equally effective laws prêt-a-porter. And indeed, "The [Supreme] Court has, however, upheld the longstanding federal 'ban on direct corporate contributions.' *Beaumont,* 539 U.S. at 154, 123 S.Ct. 2200. That is enough to demonstrate that laws banning contributions by a discrete group are not unconstitutional *per se*." *Green Party*, 616 F.3d at 204.

Depending on prior legislation enacted in other jurisdiction or at other governmental levels saves time and resources, especially the scarce resource of paying for legal fees to defend unorthodox and untested laws. This is a special concern for municipalities with already stretched budgets. For the District Court to denigrate the "off the rack" nature of Albuquerque's § 4(f) was to ignore the very practical and fiscally responsible judgments that municipal legislators must make. That the law may or may not be "off the rack" does not affect its validity. Designers since the 1950s have copied the Chanel suit jacket, but that does not affect its style. Those designers simply followed what worked. Similarly, Albuquerque followed what had worked at the federal level and in places like San Diego and New York City.

The City Councilors of Albuquerque *did* meaningfully consider whether § 4(f) fit local conditions; their discussion and their vote, like the ballot choices of 71.9% of Albuquerque voters, is self-evident proof that they considered the contribution ban appropriate for local conditions. Demanding an official pronouncement reading, "This proposal fits local conditions" goes too far. The Court could have and should have seen in the unanimous vote of the City Council, the lack of veto from the Mayor, and the choice of the voters that the people of the City of Albuquerque deemed Article XIII, § 4(f) an appropriate and necessary addition to the Albuquerque City Charter.

61

## CONCLUSION AND RELIEF SOUGHT

Appellant requests that the judgment, findings, and conclusions of the district court be reversed, that plaintiffs' complaint be dismissed in its entirety, and that Appellant be allowed, through the Board of Ethics and Campaign Practices, to enforce the City of Albuquerque's ban on campaign contributions from corporate entities.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument to assist the court in resolving the issues in this case and clarify the record, if needed. Campaign finance law is changing frequently as other circuit and district courts measure the extent of corporations' rights and responsibilities under the Constitution. Oral argument will assist the court in reconciling these decisions. Additionally, the Court may benefit from oral argument on Appellee's Motion to Dismiss for lack of standing.

Respectfully submitted,

CADIGAN LAW FIRM, P.C.

By: /s/ Kristina Caffrey

Michael J. Cadigan
Kristina Caffrey
*Counsel for The Committee to Elect
Pete Dinelli Mayor*
3840 Masthead NE
Albuquerque, NM 87109
(505) 830-2073
(505) 830-2385 (fax)
cadigan@cadiganlaw.com
kristina@cadiganlaw.com

## CERTIFICATE OF COMPLIANCE
## REGARDING ELECTRONIC SUBMISSION

Pursuant to Emergency General Order filed October 4, 2004, as amended May 23, 2005, I hereby certify that (1) all required privacy redactions have been made and, with the exception of those redactions, (2) every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk, and (3) the digital submission has been scanned for viruses with the most recent version of AVG Antivirus Business Edition 2013, and, according to the program, is free of viruses. I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

/s/ Kristina Caffrey
Michael J. Cadigan
Kristina Caffrey
*Counsel for The Committee to Elect Pete Dinelli Mayor*
3840 Masthead NE
Albuquerque, NM 87109
(505) 830-2073
(505) 830-2385 (fax)
cadigan@cadiganlaw.com
kristina@cadiganlaw.com

64

<u>**CERTIFICATE OF COMPLIANCE**</u>

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionately spaced and contains 13,996 words.

I relied on my word processor to obtain the count and the software is Microsoft Word 2007 Standard.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after reasonable inquiry.

/s/ Kristina Caffrey
Michael J. Cadigan
Kristina Caffrey
*Counsel for The Committee to Elect Pete Dinelli Mayor*
3840 Masthead NE
Albuquerque, NM 87109
(505) 830-2073
(505) 830-2385 (fax)
cadigan@cadiganlaw.com
kristina@cadiganlaw.com

## CERTIFICATE OF SERVICE

I do hereby certify that on the 16th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Phillip Patrick Baca: pbaca@nmag.gov

Jason Bowles: jason@bowles-lawfirm.com, jason@bowles-lawfirm.com, melinda@bowles-lawfirm.com

Michael J. Cadigan: cadigan@cadiganlaw.com

Kristina Caffrey: kristina@cadiganlaw.com

Colin Lambert Hunter: colin@theblf.com, info@theblf.com

Alfred Alexander Park: apark@parklawnm.com, jertsgaard@parklawnm.com, KDesselle@parklawnm.com

Gregory S. Wheeler, Assistant City Attorney: gwheeler@cabq.gov


/s/ Kristina Caffrey
        Michael J. Cadigan
        Kristina Caffrey
        *Counsel for The Committee to Elect Pete Dinelli Mayor*
        3840 Masthead NE
        Albuquerque, NM 87109
        (505) 830-2073
        (505) 830-2385 (fax)
        cadigan@cadiganlaw.com
        kristina@cadiganlaw.com

66

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


GIANT CAB COMPANY,

       Plaintiff-in-Intervention,

vs.                                        No. 13-cv-00426 MCA/ACT

AMY BAILEY, in her official capacity
as the Clerk for the City of Albuquerque, *et al.*,

       Defendants.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       This case is a First Amendment and Equal Protection challenge to Article XIII § 4(f) of

the Albuquerque City Charter ("§ 4(f)").   The parties have agreed that the Court may resolve

this case on the record before the Court, without taking live testimony.  By previous order,

Plaintiffs  Neal Greenbaum, Victor Jury, Gail Armstrong, and Dale Armstrong, and  Plaintiff-in-

Intervention Robert Torch were dismissed from this action for want of Article III standing,

leaving Plaintiff-in-Intervention Giant Cab Company ("Giant Cab")  as the sole Plaintiff.

       The Court makes the following findings of fact:

**I.**    **FINDINGS OF FACT**

       1.       Article XIII, § 4(f) of the Albuquerque City Charter provides:

*Ban on Contributions from Business Entities and City Contractors.* [1]  No
candidate shall accept a contribution in support of the candidate's campaign from
any corporation, limited liability company, firm, partnership, joint stock company
or  similar business entity or any agent making a contribution on behalf of such a
business entity.  [2] No candidate shall accept a contribution in support of the

candidate's campaign from any person, other than a City employee, who at the time of the contribution is in a contractual relationship with the City to provide goods or services to the City.  The remedy for an unknowing violation of this subsection shall be the return of the contribution.

2.     Pursuant to Article II, § 2, mayoral elections are held every four years.  Mayoral elections were held in 2001, 2005 and 2009.  A mayoral election will be held in October, 2013.

3.     Giant Cab is a corporation doing business in New Mexico;  Giant Cab does not have any contracts with the City.

4.     Giant Cab made a contribution to Janice Arnold Jones for City Council, but that donation was returned.  Giant Cab desires to make campaign contributions in Albuquerque municipal elections, and would do so but for § 4(f). [Doc. 43-1]

5.     Defendant Amy Bailey is sued in her official capacity as Albuquerque City Clerk.  Her office  administers City elections, is the repository of various campaign finance statements required by Article XIII, and otherwise assists the Board of Ethics and Campaign Practices  in administering Article XIII.

6.     The Board of Ethics and Campaign Practices ("the Board") is responsible for enforcing the provisions of Article XIII.

7.     Article XIII, § 4(e) allows individuals to contribute to a candidate up to 5% of the annual salary for the office for which the candidate is running.

8.     Candidates who violate the contribution restrictions of § 4(f) are subject to a public reprimand, a fine, or both.  Article XIII § 10(e).  Candidates who are successful in an election and who have violated this provision may be further sanctioned by suspension or removal from office.  Article XIII § 10(g).

9.     Former Albuquerque Mayor Martin Chavez was publically reprimanded in 2003

by the Board for accepting valuable gifts from those with an interest in city affairs, failing to

report certain campaign contributions and failing to abide by contribution limits. [ Doc. 48-1 to

48-6]  The inquiry leading to the reprimand and the reprimand itself were reported in the

*Albuquerque Journal*.

10.     In 2005,  former State Treasurer Robert Vigil was  indicted on federal extortion

charges.  [Doc. 22-1 at 14]; *United States v. Vigil*, Crim. No. 05-2051 JP.

11.     A procurement scandal surrounding the construction of the Bernalillo County

Metropolitan Courthouse in Albuquerque led to the indictment state Senator Manny Aragon and

others.  [Doc. 22-1]; *United States v. Martinez,* et al., Crim. No. 07-615 JEC (D. N.M.).   Former

Albuquerque Mayer Ken Schultz was implicated in the scandal.  *United States v. Schultz*, Crim.

No. 07-518 JEC (D. N.M.).

12.     It is more likely than not that all the members of the City Council, and substantial

numbers of Albuquerque voters, knew of the circumstances set out in the preceding three

paragraphs, as these events were widely reported by the local media.

13.     During the February 5, 2007 City Council meeting at which § 4(f) was placed on

the ballot,  its sponsor, Councillor Michael Cadigan, represented to the City Council that the

purpose of the provisions banning corporate campaign contributions was to "match federal law."

Councillor Cadigan represented that the purpose of the provision banning contributions by city

contractors was to remove the perception of "pay to play."   City Attorney Robert White was

present and spoke to First Amendment concerns presented by the city contractor ban.

Councillor Cadigan observed that the entity and city contractor bans overlapped as most

contractors would be covered by the entity contribution ban. Councilor Martin Heinrich spoke to

the interests of eliminating the public perception of "pay to play" politics and preventing

circumvention of the individual campaign contribution limits through "double dipping."   The

City concedes that "no City Councilor voiced any concern regarding actual 'pay to play'

corruption; rather, the debate centered on the appearance of impropriety." [Doc.47 at 3] The City

Counsel voted in favor of placing the proposed amendment before the voters.  [Doc. 14 at 21]

14.    The amendment containing  § 4(f)  was submitted to the voters on the Regular

Municipal Election Ballot of October 2, 2007.   Approximately seventy-two per cent of the

voters voted in favor of the amendment. [Doc. 14 at 23]

15.    Other than the passing comments by the City Council members referred to above,

the Court has not been presented with any legislative history of § 4(f).  There are no findings by

the City Council.  There is no evidence proffered that the City actually investigated the

relationship of corporate campaign contributions to *quid pro quo* corruption or the circumvention

of individual contribution limits or that the City Council conducted studies or surveys of voter

concerns with corporate campaign contributions. There was no discussion of why an absolute

ban on corporate contributions, rather than a contribution limit, was appropriate.

16.    There are no references in the record to evidence developed by other jurisdictions

that the City Council "reasonably believed to be relevant" to the problem of *quid pro quo*

corruption or the appearance of such corruption in Albuquerque municipal elections.  *See*

*Homans v. City of Albuquerque*, 366 F.3d 900 (10th Cir. 2004) (citing *City of Renton v. Playtime*

*Theatres, Inc.*, 475 U.S. 41, 51-52 (1986)).

17.    There is no evidence proffered that the City Council,  prior to enacting the

resolution placing § 4(f) on the ballot, considered objective evidence of the extent of

participation by business corporations in "pay to play" schemes or the use by individuals of the corporate form to circumvent individual contributions limits.

18.    The Court has noted the overwhelming support for the amendment containing § 4(f) among voters, but the Court has no way of knowing why these voters approved the amendment containing § 4(f).  The Court cannot determine whether they were motivated by the constitutionally permissible interest in eliminating or reducing *quid pro quo* corruption, or the appearance of such corruption, as opposed to the constitutionally infirm desire to single out corporate political speech for less favorable treatment based on the speaker's corporate identity.

19.    Article XIII, § 4(d) provides that a candidates for the offices of City Councilor and Mayor may not accept contributions in excess of twice the annual salary for the office sought.  Given the salaries authorized at the time that the City Council was considering placing Article XIII, § 4(f) on the ballot, individual campaign contributions were limited to maximums of $450 per election per candidate for City Council and $4500 per election per candidate for mayor.

20.    Prior to the enactment of Article XIII, § 4(f), combined contributions by an individual and an affiliated corporation rarely, if ever, exceeded the individual contribution limits described in the preceding paragraph.

In light of the foregoing, the Court enters the following conclusions of law:

I.    **CONCLUSIONS OF LAW**

1.    Giant Cab has standing to challenge § 4(f)'s ban on contributions by business corporations.  *See Lavin v. Husted*, 689 F.3d 543, 546 (6th Cir. 2012) ("[T]he plaintiffs suffered cognizable harm under the First Amendment when the . . . campaign refused their campaign

contributions; and that refusal was plainly traceable to the statute challenged here." (internal

citation omitted)).

2.      "Limits on contributions must be 'closely drawn to achieve a "sufficiently

important" government interest.' . . . This distinguishes them from limits on expenditures, which

are subject to strict scrutiny. . . . The Supreme Court has adhered generally to 'this line between

contributing and spending.'"  *Vt. Right to Life Comm. v. Sorrell*, 875 F. Supp. 2d 376, 402 (D. Vt.

2012) (citations omitted); *accord Ognibene v. Parkes*,  671 F.3d 174, 182-83 (2d Cir. 2011).

3.      The closely-drawn standard applies both to limits and outright prohibition of

corporate political contributions: "[T]he Supreme Court has held that while it is 'not that the

difference between a ban and a limit is to be ignored . . . the time to consider it is when applying

scrutiny at the level selected, not in selecting the standard of review itself.'"  *Thalheimer v. City*

*of San Diego*,  645 F.3d 1109, 1124 n.4 (9th Cir. 2011) (affirming district court's denial of

injunction against municipal ban on corporate campaign contributions).

4.      Prior to *Citizens United v. FEC*, 558 U.S. 310 (2010), the Supreme Court had

recognized four government interests supporting restrictions on corporate political contributions:

"anti-corruption, anti-distortion, dissenting-shareholder, and anti-circumvention." *United States*

*v. Danielczyk*, 683 F.3d 611, 616 (4th Cir. 2012).  "*Citizens United* preserved two of the four

important government interests recognized in *Beaumont*:  anti-corruption and anti-

circumvention."  *Id.* at 618. *Citizens United* expressly rejected the anti-distortion rationale, and

disapproved of the dissenting shareholder rationale.  *Id.* at 618-19.

5.      Given existing precedent, there is no question that preventing *quid pro quo*

corruption or the appearance of corruption and preventing the circumvention of individual

6

campaign contribution limits are important government interests.

6.     "[T]he quantum of empirical evidence needed to satisfy heightened judicial

scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the

justification raised." *Nixon v. Shrink Missouri  Gov't PAC*, 528 U.S.377,  391 (2000).

Restrictions on corporate campaign contributions are not novel.  Congress and various state

legislatures  have barred corporations from making direct contributions to candidates for over a

hundred years.  *Citizens United*, 558 U.S. at 343.  Given this history, a ban on corporate

campaign contributions is neither novel nor implausible, and therefore the Court concludes that

the City's evidentiary burden is toward the lower end of the scale.  Even though this evidentiary

burden may be comparatively light, the First Amendment requires something more than "mere

conjecture" about the necessity for a given restriction on campaign contributions. *Citizens for*

*Clean Gov't v. City of San Diego*,  474 F.3d 647, 653 (9th Cir. 2007) (discussing *Shrink Missouri*

*Gov't*).

7.     Although the proponents of § 4(f)'s ban on corporate contributions have identified

two important interests that conceivably could be furthered by the ban on corporate

contributions--eliminating or reducing the appearance of "pay to play" corruption or the

circumvention of individual campaign contribution limits, they have  not satisfied their

evidentiary burden of showing that§ 4(f) is closely drawn to further those interests.  The First

Amendment problem with § 4(f) derives from the City Council's approach of simply taking

another jurisdiction's contribution restrictions "off the rack,"  without meaningful consideration

of whether those restrictions fit local conditions.

8.     Unless and until the City Council develops an evidentiary record demonstrating

(1) a likelihood that there  is a perception among Albuquerque voters that corporate campaign contributions lead to "pay to play" corruption or that corporate contributions are employed to circumvent individual contribution limits and (2) that there is a close fit between a complete ban on corporate contributions and the stated goals of reducing the perception among voters of "pay to play" corruption and preventing circumvention of individual contribution limits, §4(f)'s ban on corporate campaign contributions cannot be sustained in the face of a First Amendment challenge.

9.      The portion of Article XIII, § 4(f) providing that "[n]o candidate shall accept a contribution in support of the candidate's campaign from any corporation, limited liability company, firm, partnership, joint stock company or similar business entity or any agent making a contribution on behalf of such a business entity" violates the First Amendment. when applied to business corporations such as Giant Cab.

10.      Plaintiff is entitled to declaratory and injunctive relief, which the Court will order in a separate judgment.

11.      In view of the Court's  determination that Article XIII, § 4(f) violates the First Amendment, the Court will not address Plaintiffs Equal Protection challenge.

**Entered this 4th  day of September, 2013.**

M. CHRISTINA ARMIJO
Chief United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NEAL GREENBAUM, et al.,

       Plaintiffs,

vs.                                      No. 13-cv-00426 MCA/ACT

AMY BAILEY, in her official capacity
as the Clerk for the City of Albuquerque, et al.,

       Defendants.


## <u>JUDGMENT</u>

    In accordance with the Court's  Findings of Fact and Conclusions of Law entered contemporaneously herewith, [Doc. 69], Judgment is entered as follows:

    **IT IS HEREBY ORDERED and DECLARED** that the portion of Article XIII, § 4(f) of the Albuquerque City Charter providing that "[n]o candidate shall accept a contribution in support of the candidate's campaign from any corporation, limited liability company, firm, partnership, joint stock company or similar business entity or any agent making a contribution on behalf of such a business entity" violates the First Amendment of the United States Constitution as applied to business corporations, including Plaintiff-in-Intervention Giant Cab Company.

    **IT IS FURTHERED ORDERED** that Defendants Amy Bailey, in her official capacity as Clerk for the City of Albuquerque and City of Albuquerque Board of Ethics and Campaign Practices are enjoined from enforcing against business corporations, including Plaintiff-in-Intervention Giant Cab Company, the portion of Article XIII, § 4(f) of  the Albuquerque City Charter providing that "[n]o candidate shall accept a contribution in support of the candidate's

campaign from any corporation, limited liability company, firm, partnership, joint stock

company or similar business entity or any agent making a contribution on behalf of such a

business entity"

**Entered this 4th day of September, 2013.**


M. CHRISTINA ARMIJO
Chief United States District Judge